IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.                           CRIMINAL ACTION NO. 1:10CR07

MICHAEL J. PAVLOCK and
RICHARD W. POWELL, JR.,

         Defendants.

**<u>ORDER, OPINION / REPORT AND RECOMMENDATION</u>**

<u>I</u>
<u>PROCEDURAL HISTORY</u>

On the 10th day of February 2010 came the United States by Assistant United States Attorney Andrew Cogar [Cogar] and also came the defendants, Michael J. Pavlock [Pavlock] and Richard W. Powell, Jr.[Powell], in person, and by their counsel, Jennifer McGinley [McGinley], and by their respective counsel appointed for the purpose of assisting them in the F.R.Cr.P. 44(c) hearing, to-wit: Thomas Dyer [Dyer] for Powell and FPD Brian Kornbrath [Kornbrath] for Pavlock, all pursuant to on the United States' Motion to Disqualify Counsel [DE 23] which motion was referred to the undersigned by Order of the District Judge entered January 20, 2010 [DE 26] .

<u>F.R.Crim.P. 44 (c) Procedure</u>

The Court then excused everyone except Powell, McGinley, Dyer, the Court's Clerk, and a court security officer from the hearing room in order to conduct F.R.Cr.P. 44(c) *en camera* hearing of Powell, to which procedure the United States objected and which objection was overruled for the reasons stated on the record.

Once the hearing room was cleared of everyone except Powell, McGinley, Dyer, the Court's Clerk and a court security officer, the Court proceeded with the *en camera* hearing by receiving the sworn testimony of Powell and McGinley all in response to questioning by the Court.

At the conclusion of the *en camera* hearing concerning Powell, the Court admonished Powell, McGinley and Dyer to not discuss the matters with anyone until the entire hearing had been completed and proceeded to then excuse everyone. Pavlock, McGinley, Kornbrath, the Court's Clerk, and a court security officer then entered the hearing room in order to conduct F.R.Cr.P. 44(c) *en camera* hearing of Pavlock.

Once the hearing room was cleared of everyone except Pavlock, McGinley, Kornbrath, the Court's Clerk and a court security officer, the Court proceeded with the *en camera* hearing by receiving the sworn testimony of Pavlock and McGinley all in response to questioning by the Court. At the conclusion of the *en camera* hearing concerning Pavlock, the Court admonished Pavlock, McGinley and Kornbrath to not discuss the matters with anyone until the entire hearing had been completed. Thereafter, the Court reconvened the public hearing with the United States by Assistant United States Attorney, Andrew Cogar [Cogar], the defendants, Michael J. Pavlock [Pavlock] and Richard W. Powell, Jr.[Powell], and their counsel, Jennifer McGinley [McGinley], and their respective counsel appointed for the purpose of assisting them in the F.R.Cr.P. 44(c) hearing, being present.

The Court then heard final arguments from the United States, McGinley, Dyer and Kornbrath.

The Court then orally ordered and now, in this written order, **CONFIRMS** said oral order **AND HEREBY ORDERS** that the record of the *en camera* hearings involving Pavlock, Powell, and

McGinley **BE SEALED BY THE CLERK, said record of Powell's *en camera* hearing to be viewable only by the Court, Powell, Dyer, McGinley and any future counsel who may be representing Powell in the within criminal case and said record of Pavlock's *en camera* hearing to be viewable only by the Court, Pavlock, Kornbrath, McGinley and any future counsel who may be representing Pavlock in the within criminal case** to which sealing the United States objected which objection was and is **OVERRULED** for the reasons stated on the record.

The hearing being completed, the Court then closed the record and took the matter under consideration.

## OPINION/REPORT AND RECOMMENDATION

I.

Facts

The relevant facts are adequately outlined in the Court's prior order dated February 2, 2010 [DE 37]. However, since Defendants filed documents that now are construed as a motion for reconsideration of that Order, the Court reviewed the transcript of the prior hearing prepared after the February 2, 2010 Order and now resubmits findings of facts supported by the transcript. In addition, the factual findings previously made and herein repeated were generally verified by the testimony during the *en camera* hearings and by the Memorandum in Opposition and Amended Response in Opposition filed by Defendants [including exhibits] on February 9, 2010 [DE 40 and 41].

Attorney Jennifer McGinley [McGinley] represents Michael J. Pavlock [Pavlock] and Richard W. Powell, Jr. [Powell] in the pending criminal action and she represents Robert Konchesky

3

[Konchesky] in his Third Party Motion for Hearing and Motion to Stay.[1] McGinley has been representing the three men for approximately 19 months.

In 1999 Konchesky and Pavlock[2] allegedly entered into a settlement agreement. The agreement was allegedly in settlement of claims Pavlock and others had against Konchesky for activities amounting to intentional interference in business relations resulting in damages. Pavlock allegedly approached Konchesky offering to settle the claims to prevent Konchesky from being financially ruined. [Tr. 8-9, 34]. The investigation of the FBI, which included interviews of most if not all of the alleged victims of Konchesky's business interference, raised questions as to what if any damages were suffered. [Tr. 9].

Although Konchesky acknowledged some sort of agreement was reached in 1999, he was either unable or unwilling to tell FBI Special Agent Fox why he felt the need to enter into the agreement. [Tr. 39, 54, 56]. No written agreement was signed by the parties. [Tr. 10, 34].

According to the proffer of counsel for Defendants, the basic terms of the informal settlement agreement were that Konchesky would underwrite the costs of starting businesses to be operated and controlled primarily by Pavlock, presumably to make money for those who allegedly lost money at the hands of Konchesky's alleged business interference activity. According to FBI Special Agent Fox, it was Konchesky and his sister who provided the funding. [Tr. 26]

From 1999 to the date of the indictment which brings Pavlock before the Court, Pavlock was in control of various businesses and assets funded by Konchesky and Konchesky's sister and

---

[1] McGinley represents that she represents one or more of the individuals in several other matters (9) pending outside of this Court.

[2] Pavlock allegedly represented a number of people who owned businesses and held properties allegedly damaged by Konchesky.

allegedly used those businesses for his and co-defendant Powell's personal benefit. The FBI investigation determined there were between 25 and 30 such businesses connected to the settlement agreement and of those only 5 to 10 actually engaged in some business. [Tr. 11-13].

Notwithstanding Pavlock's management and control of these businesses, the investigation revealed that the businesses did not turn a profit in the 10 years since the agreement was reached [Tr. 13] and that Pavlock did not have any credit card accounts, any bank accounts, or a valid driver's license. [Tr. 21].

Pavlock and Powell may own several, perhaps as many as 18 business properties in West Virginia and Pennsylvania. [Tr. 51].

Konchesky complained to FBI Special Agent Fox that he had not gotten his money back, [Tr. 47] but has never claimed to be a victim. However, Konchesky has made representations that Pavlock has suggested to him that he needed to continue to work with him or he and his sister would lose everything they had put into the deal. Konchesky has represented he continues to work with Pavlock because he and his sister are desperate to get something out of the relationship in the end. [Tr. 49-53]. Pavlock, and Powell through Pavlock, are solely dependent on Konchesky for their income. [Tr. 17, 19, 21, 33]. Pavlock, without the knowledge of Konchesky, used Konchesky's funds funneled through a shell company to pay the lease on Pavlock's girlfriend's[3] condominium. [Tr. 22-25]. Pavlock also received at least three vehicles: a Porsche Boxster, a Corvette, and a Ford truck. [Tr. 20].

---

[3]Pavlock's girlfriend did not show any employment income by way of W-2 and is not known to have done any substantive work.

Edith Konchesky, sister of Robert Konchesky, has contributed approximately 1.5 million dollars to Pavlock's businesses without return. [Tr. 26-28]. This has left her, an elder person, with no liquid assets. [Tr. 26]. She was subpoened to give testimony before the grand jury May 9, 2009. When she was contacted by Special Agent Fox with the subpoena, she advised agent Fox that he should tell Jennifer McGinley of the subpoena because McGinley was representing her. Agent Fox advised McGinley of the subpoena. [Tr. 36-37]. McGinley discussed with Pavlock and Robert Konchesky the fact that Edith Konchesky had been subpoened to testify. Powell made the statement that "Edith cannot testify." That night Edith Konchesky was admitted to the hospital and kept until the next day. She did not attend the grand jury session and did not give testimony. [Tr. 27-28].

Powell is Pavlock's employee in some of the businesses. In addition, Pavlock and Powell are friends. As an employee, Powell takes direction from Pavlock. [Tr. 29-33].

McGinley obtained and filed an affidavit from Robert Konchesky in opposition to the Government's Motion to Disqualify Counsel. Konchesky identifies McGinley as his attorney [DE 32 p. 1].

McGinley states in argument and affidavit that Powell and Pavlock are not in conflict with each other; that neither will "ever plead guilty to anything, period;" that they "plan to go to trial and clear their names;" and that there "is no conflict amongst them and they stand together." [DE 32 p. 5-6].

Konchesky filed his own affidavit in which he avers that: between 1991 and 1995 he loaned Pavlock approximately $350,000.00 which was not paid back causing Konchesky to sue and obtain a judgment of $664,000.00 [Tr. 14-16][DE 40, Exhibit A - Confessions of Judgment dated February

2, 1996 and August 28, 1996][4]; he took lands to secure payment of the judgment; he lost some or all of the lands taken as security [Tr 14-16]; he interfered with businesses; the losses from the lost lands and business interference approximated between $3,285,000.00 and $5,000,000.00 which he believed he owed Pavlock and his business partners; in lieu of being sued and having to liquidate assets, Konchesky agreed to settle; Konchesky agreed to loan the equivalent of $3,285,000.00 and $5,000,000.00 to the various parties to the settlement within 18 months of January 15, 1999; Konchesky and some others who were part of the settlement were in conflict and Pavlock acted as a buffer between Konchesky and them; pursuant to the suggestion of Pavlock to avoid unfavorable atmosphere surrounding Konchesky in Morgantown, the focus of the business operations was moved to Point Marion and Uniontown, Pennsylvania in 2005; Konchesky's efforts to obtain loans from Huntington Bank and Westbanco failed resulting in him borrowing the necessary monies from his

---

[4]

McGinley wrote the Court after the January 26, 2010 hearing advising the Court that Lewis A. Clark prepared documents on West & Jones letterhead while the undersigned Magistrate Judge was a partner in the same law firm pertaining to a property transaction involving Pavlock. Counsel did not seek recusal. On February 9, 2010 McGinley attached two letters and a copy of a check for $50,000 to Defendants" Amended Response And Objection To Motion To Disqualify Counsel [DE 40, Exhibit B and C] bearing the signature of Lewis A. Clark on West & Jones letterhead dated May 20, 1998 and May 21, 1998. Both documents were signed by Clark while the undersigned was a partner in the firm of West & Jones. Both documents refer to a deposit payment of $50,000 of a $440,000 total consideration by Pavlock for a piece of property subject to contracts of sale being prepared and that the partial payment would cause Konchesky to release a judgement he had obtained against Pavlock, the dismissal of two civil actions by Konchesky against Luzader and Pavlock and Konchesky's release of a judgment against Graham. It is obvious that Lewis A. Clark was acting in his capacity as counsel for Pavlock at the time of the issuance of the two letters and the $50,000 check. No request for recusal of the undersigned was made at the hearing of February 10, 2010 or in the Defendants Amended Response And Objection To Motion To Disqualify Counsel. Moreover, McGinley attached Exhibit J, DE 40, a June 28 2004 letter from Spencer W. Graham, II MBA, to Jerry Jones, a partner of West & Jones acknowledging that Lewis Clark was "our attorney from late in 1997 until 2001." The undersigned left the private practice of law on August 13, 2001 to assume the present position as Magistrate Judge.

sister, Edith Konchesky; Konchesky funded Golden Investment Acquisitions, LLC with some of the money he got from his sister; "as a result of the chaotic atmosphere brought on by my circumstances, several of the 1999 Settlement Agreement parties began to assert negative opinions about me..." resulting in "[t]his turmoil morphed into legal and financial interferences that have necessitated the alignment of myself, Michael J. Pavlock, Spencer Graham, Richard W. Powell, Jr. and Edith Konchesky...."; "the entire year of 2006 was full of backstabbing and double crossing from several of the other members of the 1999 Settlement Agreement ..." resulting in them contacting the FBI "to investigate Michael J. Pavlock"; he has loaned sums of money to a number of businesses and people; he trusts the judgment, expenditures and decisions of Michael J. Pavlock; he has directed Jennifer McGinley to act in his behalf to prevent her from being disqualified as counsel for Pavlock, to recover the vehicles taken by the Government under the Court's protective order, and to protect him and his family from further government intrusion; he denies he is an unwitting victim of a scheme involving the 1999 Settlement Agreement; and that the money provided to Pavlock for the benefit of Cunic was to meet business costs associated with business developments in Washington County, Pennsylvania where she was in charge of marketing. [DE 32 1-11].

McGinley attached Exhibits K [Memorandum of Understanding signed by Pavlock, Konchesky and others on February 7, 2007 and Interim Cooperation And Settlement Agreement signed by Pavlock, Graham, Konchesky and others], J [letter from Spencer Graham II to Jerry Jones dated June 28, 2004 and G [Affidavit and Transcript of testimony of James Hall] to DE 40. These documents confirm that Pavlock was in charge of the settlement negotiations and management of the settlements over a period of years between 1998 and 2008; that allegations were made that Robert Konchesky frustrated or interfered with or breached each settlement agreement made; that

Edith Konchesky was a victim and party interested in settlement of her claims against her brother, Robert Konchesky. Exhibit N, DE 40 is a copy of an Emergency Petition For Injunctive Relief filed by Jennifer McGinley as counsel for Robert J. Konchesky against JDLMP, *et al* in late 2008 and served for hearing in mid 2009. McGinley filed an affidavit dated January 25, 2010 wherein she states in part under oath:

> 4. My client of approximately 16 months, Robert J. Konchesky, has repeatedly told me that he is not an unwitting victim of any alleged scheme perpetrated by Michael J. Pavlock as suggested by the Government.
>
> 5. I represent Michael J. Pavlock, Robert J. Konchesky, and / or Richard Powell in the following legal matters:
>
>> a. ... Robert J. Konchesky was successful in his petition to set aside a deed of trust sale as a result of Michael J. Pavlock's testimony and preparation for hearing in this matter. Further Michael J. Pavlock and Robert J. Konchesky have entered into a purchase agreement for ...Konchesky to sell the subject property to ...Pavlock.[5]

The exhibits attached to DE 40 support the Court's oral conclusion stated on the record at the January 26, 2010 hearing: "I will say as a prelude ... on the record, this entire scenario starts in conflict." [DE 38 p. 63]. Moreover, the documents establish clearly and convincingly that in the history of the relationship between Pavlock and Konchesky there have been times the two have been at odds with each other and times when the two have been "in bed" together. The documents further

---

[5]Only one of the many matters in which McGinley represents Pavlock and Konchesky has been added in the body of this opinion, report and recommendation.

establish the control that Pavlock has in the settlements with Konchesky; over Konchesky; over the assets involved in those settlements; and, that Edith Konchesky, notwithstanding her lately filed statements to the contrary, has been characterized as a victim of the dealings contrived by her brother alone or in concert with Pavlock. The documents also establish McGinley has been representing and continues to represent Pavlock, Powell and the two Koncheskys notwithstanding that they have had actual conflicting interests and continue to have potential conflicting interests.

No affidavits, waivers or testimony were presented by Pavlock or Powell. McGinley does not have a state bar ethics counsel's advisory opinion that there is no conflict of interest. [Tr. 58].

## II.

### Defendants' Amended Response And Objection To Motion To Disqualify Counsel

The law pertaining to the existence of a conflict of interest was appropriately set forth in this Court's Order dated February 2, 2010; remains applicable to the Court's consideration of Defendants' Amended Response And Objection To Motion To Disqualify Counsel [DE 40]; and does not bear repeating in this Order.

### ORDER

Upon consideration of the newly filed affidavits, exhibits and arguments of Counsel for Defendants, the Court finds no basis on which to reconsider its ruling and Order of February 2, 2010 [DE 37].

Accordingly, the Order of February 2, 2010 and its findings and conclusions is **AFFIRMED** and **Defendants' Amended Response And Objection To Motion To Disqualify Counsel deemed a motion to re-consider the Court's prior Order finding that a conflict of interest existed [DE 40] is DENIED.**

The Clerk is hereby directed to remove said motion [DE 40] from the docket of motions actively pending before the Court.

III.

Issues

The sole remaining issues pending before the Court are whether the conflict found can be waived; if so, whether Defendants, or either one of them have made a knowing and voluntary waiver of the same; and whether the Court is bound to accept any waivers of conflict.

IV

Law

"The Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'" United States v. Morrison, 449 U.S. 361, 364 (1981). The underlying purpose behind providing for the right to counsel "is simply to ensure that criminal defendants receive a fair trial." Strickland v. Washington, 466 U.S. 668, 689 (1984).

For those who are able to afford retained counsel, the Sixth Amendment also guarantees, subject to certain limitations, "the right of any accused ... to be represented by an attorney of his own choosing." United States v. Inman, 483 F.2d 738, 739-740 (4th Cir. 1973). The Court's violation of that right is viewed as structural error and therefore not subject to the application of the harmless error analysis on review. United States v. Gonzalez-Lopez, 548 U.S. 140, 148-149 (2006).

However, the Court's inquiry with respect to disqualification of a chosen counsel "focuses on the adversarial process, not on the accused's relationship with his lawyer as such" because "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth

Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988) citing: United States v. Cronic, 466 U.S. 648m 657, n. 21 (1984) and Morris v. Slappy, 461 U.S. 1, 13-14 (1983).

"[P]ermitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of effective assistance of counsel." Holloway v. Arkansas, 435 U.S. 475, 482 (1978). However, "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing ... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another." Id. at 489-490.

There is no flat rule that defendants are entitled to counsel of their own choosing or that, in the face of a conflict of interest, all the defendants have to do is provide a waiver. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, *supra* at 160; United States v. Scott, 980 F. Supp. 165, 167-168 (EDVa 1997).

West Virginia Rule of Professional Conduct 1.7 provides:

**(a)** A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

**(b)** A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

"[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented." Id. at 162. Thus "when a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver." United States v. Dolan, 570 F.2d 1177, 1184 (3rd Cir. 1978) cited with approval in Wheat, *supra* at 162.

Recognizing that the conflict of interest inquiry is necessarily conducted with foresight as opposed to hindsight and that the inquiry is murky at best, "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. at 163.

In <u>Holloway</u>, *supra* at 489-490, the Court noted:

> The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to access and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

V.

<u>Discussion</u>

Pavlock and Konchesky have been in direct and actual conflict with each other since their business dealings led to Konchesky obtaining the 1996 judgment against Pavlock. Konchesky thereafter engaged in activity which brought him into conflict with Pavlock and others who were claiming business interference damages. Whether Konchesky really believed he had done something wrong or was convinced by Pavlock and others that he had, Konchesky entered into some sort of deal or a combination of deals with Pavlock to allow Pavlock substantial control over money and assets held by Konchesky and/or acquired with Konchesky money. The fact that Konchesky complained to the FBI that he did not get his money back suggests that he is in continuing conflict with Pavlock even though he may be too deep in bed with Pavlock to now get out for fear of losing everything.

Edith Konchesky, like her brother, is represented by McGinley. Edith Konchesky has complained to the FBI that her brother took money from her which is claimed to have been used in her brother's dealings with Pavlock.

The FBI has signaled its intent to call Edith Konchesky and her brother, Robert, as witnesses in the case against Pavlock and Powell.

Given the above, it is inappropriate to permit McGinley to continue representing Pavlock when to do so would require her to cross examine her other clients: Robert Konchesky and Edith Konchesky. McGinley's loyalties would be divided in violation of West Virginia Rule of Professional Conduct 1.7(b). The Court is hard pressed to understand how McGinley could effectively now know that she could cross examine either Edith Konchesky or Robert Konchesky as required given that no discovery has been provided her in this criminal case and she cannot know what documents may be presented at trial. To permit McGinley to continue to represent Pavlock in light of her representation of the Koncheskys encourages her to breach her duty of loyalty which is "perhaps the most basic of counsel's duties." Strickland, *supra* at 692. Moreover, her ability to cross examine Edith Konchesky in behalf of Pavlock may be materially limited by her representation of Edith or by her representation of Robert Konchesky in violation of WV Rule of Professional Conduct 1.7(b). McGinley cannot possibly reasonably believe that her representation would not adversely affect one or more of her four clients, including the two defendants in this criminal case. Id. Such actual conflicts of interest may be the basis for Pavlock, if convicted, to claim that he received ineffective assistance of counsel. Id. "[W]hen counsel for a defendant in a criminal case has an actual conflict of interest ... and [it] adversely affects counsel's performance in the defense of the defendant, prejudice to the defendant is presumed and a new trial must be ordered." United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991).

Pavlock is charged in all but one of the counts of the indictment where Powell is charged in only two of the counts. During the 44(c) hearing, both defendants insisted there was no conflict

15

between them; acknowledged they did not know what the government would introduce in the case against them; and acknowledged that there was a possibility of a potential conflict of interest developing during the trial they could not now foresee.  According to the defendants they each had discussed conflicts of interest with McGinley separately and together and since the Court hearing of February 2, 2010 had discussed the conflict of interest issue with counsel other than McGinley.  However, Pavlock and Powell insisted they wanted to continue to have McGinley represent them.

Even though it appears that Pavlock and Powell are prepared to make voluntary waivers of the potential conflicts that may exist between them, because no discovery has yet taken place, the Court cannot find the waivers are being offered "knowingly."  Holloway v. Arkansas, *supra* at 489-490.  Pavlock was adamant that no conflict existed but seemed to leave the door open to asking for new or seeking new counsel should a conflict appear in the remaining proceedings to trial.

Pavlock and Powell are each entitled to the undivided loyalty of their respective counsel.  McGinley may be placed in the untenable position of cross-examining her own client should one of the defendants be offered and take a plea deal that requires his testimony against the other at a trial.  McGinley may be placed in the untenable position of advising one of her clients whether or not he should take the stand to testify in his own defense knowing that the government will have the right of cross examination should he take the stand and such examination may elicit testimony adverse to her other client.  McGinley may be placed in the untenable position of arguing at sentencing that one defendant is more or less culpable than the other.  Failure to do so if merited constitutes a breach of duty to advocate that which is in a client's best interest.

The possibilities of potential conflicts of interest between Powell and Pavlock where McGinley's loyalties would be actually divided or perceived to be divided are virtually limitless under the circumstances of this case.

Notwithstanding Pavlock's and Powell's willingness to waive conflicts of interest and even if no actual conflict of interest exists between Pavlock and the Koncheskys which would preclude her participation in this case, to permit McGinley to continue representing the defendants, would invite ethics complaints against McGinley, claims of ineffective assistance of counsel claims against McGinley, and would undermine the public's confidence in the fair and impartial administration of justice. Wheat, *supra* at 160.

In U.S. v. Howard, 115 F.3d 1151 (4th Cir. 1997), the district court had been concerned over an attorney's representation of both a defendant and his superiors in an alleged drug organization, whose interests appeared to conflict with the defendant's. The defendant appealed his conviction, arguing that by disqualifying his chosen counsel, the court deprived him of his Sixth Amendment right to counsel of choice. As in this case, the defendant in Howard argued that he was satisfied with his counsel's representation, and "that the court should have foreseen that the conflict would never arise . . . ." The Fourth Circuit agreed there was a right to be represented by an attorney of one's own choosing, but noted that right was not absolute, citing Wheat. The Fourth Circuit then stated:

> Trial judges may on occasion be required to decline a defendant's offer to waive his own attorney's conflict of interest and indeed district courts "must be allowed substantial latitude" in rejecting waivers of this sort. *Id.* This circuit has insisted that a trial court "must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal" if it disqualifies a defendant's chosen lawyer. *United States v. Williams*, 81 F.3d 1321, 1324 (4th Cir. 1996).

We hold that the district court did not abuse its discretion in disqualifying Vernell as Howard's counsel. A district court has an obligation to foresee problems over representation that might arise at trial and head them off beforehand.

For the reasons stated herein, inasmuch as McGinley has been representing and consulting with both defendants as well as witnesses proposed to be called by the United States in its case against the defendants, the undersigned recommends she should be disqualified from representing both Pavlock and Powell in order to:

1. Preserve the integrity of the court and its proceedings;

2. Preserve the standards of professional ethics; and

3. Preserve the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in her own court and the subtle problems implicating the defendant's comprehension of the waiver.

Wheat, supra at 162. The undersigned rejects the seemingly sincere but ill-founded request by Defendants to utilize the same counsel and their waiver of any conflict in the dual representation. Id. at 163.

## RECOMMENDATION

For all the above reasons, it is **RECOMMENDED** that the United States' Motion To Disqualify Counsel [DE 23] be **GRANTED**, and that counsel, Jennifer McGinley, be prohibited from representing either Pavlock or Powell.

Any party may, within fourteen (14) days after being served with a copy of this Opinion, Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Opinion, Report and Recommendation to which objection is made, and the basis for

such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Opinion, Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

Dated: February 19, 2010.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE